UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

JONATHAN PARKER,

                    Petitioner,              No. 04-CV-0826(VEB)
          -vs-                               **DECISION AND ORDER**

WILLIAM PHILLIPS,

                    Respondent.

## I.    Introduction

*Pro se* petitioner Jonathan Parker ("Parker" or "petitioner") has filed a petition for a writ

of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction following a jury trial

on charges of murder and attempted murder. The parties have consented to disposition of the this

matter by a magistrate judge pursuant to 28 U.S.C. § 636(c).

## II.    Background

Parker was indicted by an Erie County Grand Jury on charges of  Murder in the First

Degree (New York Penal Law ("P.L.") § 125.27(1), Murder in the Second Degree (P.L.§

125.25(1)), Attempted Murder in the First Degree (P.L. §§ 110.00, 125.27(1)), Attempted

Murder in the Second Degree (P.L. §§ 110.00, 125.25(1)), Aggravated Assault on a Police

Officer (P.L. § 120.11), Assault in the First Degree (P.L. § 120.10(1)), Criminal Possession of a

Weapon in the Second Degree (P.L.§ 265.03) and Criminal Possession of a Weapon in the Third

Degree (P.L. § 265.02(4)). The charges arose from an incident in which Buffalo Police Officer

Charles McDougald was fatally shot, and his partner, Buffalo Police Officer Michael Martinez,

was shot in the foot, on April 9, 1997, in the City of Buffalo. The Erie County District Attorney

filed a notice of intent to seek the death penalty. New York's death penalty statute authorizes a prosecutor to file a notice of intent to seek the death penalty against a defendant charged with murder in the first degree. *See* N.Y. PENAL LAW § 125.27; N.Y. CRIM. PROC. LAW § 250.40. Upon conviction by a jury, a capital defendant faces a separate sentencing proceeding before a jury to determine whether the penalty imposed will be death or life imprisonment without parole. *See* N.Y. CRIM. PROC. LAW § 400.27.

Following a jury trial, Parker was convicted of first degree murder, attempted first degree murder, aggravated assault on a police officer and both counts of weapon possession. At the conclusion of the penalty phase of Parker's trial, the jury determined that, based on Parker's first degree murder conviction, he should not receive the death penalty but instead be sentenced to life imprisonment without the possibility of parole.

Parker was sentenced, on November 30, 1998 as follows: a term of life imprisonment without the possibility of parole on the first degree murder conviction, twenty-five years to life on the first degree attempted murder, twelve and one-half to twenty five years on the conviction for aggravated assault, seven and one-half to fifteen years on the second degree weapon possession, and three and one-half to seven years on the third degree weapon conviction. The sentence imposed on the convictions related to Officer Martinez were ordered to be served consecutively to any sentence petitioner was then serving. The sentence on the conviction for murdering Officer McDougald was ordered to be served consecutively to the sentences regarding the Officer Martinez convictions and any other sentence petitioner was serving at the time.

Petitioner's appeal was timely perfected and the Appellate Division, Fourth Department, issued a memorandum decision and order on February 7, 2003, in which the court unanimously

affirmed his conviction but modified the structure of his sentences. *People v. Parker*, 304 A.D.2d 146, 755 N.Y.S.2d 521(App. Div. 4th Dept. 2003). Leave to appeal to the New York Court of Appeals was denied on July 17, 2003. *People v. Parker*, 100 N.Y.2d 585 (N.Y. 2003).

This timely habeas petition followed. For the reasons set forth below, the request for a writ of habeas corpus is denied and the petition is dismissed.

## III.  Discussion

### A.  Denial of Right to Enter a Guilty Plea to First Degree Murder

Parker contends that he was deprived of the right to enter a guilty plea based on the constitutional infirmity of several sections of New York's Criminal Procedure Law (C.P.L. § 220.10(5)(e), C.P.L. § 220.30(3)(b)(vii), and C.P.L. § 220.60(2)). Parker claims that if he had been allowed to plea bargain, he possibly could have obtained a sentence allowing for the possibility of parole.

As originally enacted, the statute afforded a defendant the opportunity to ensure a maximum sentence of life without parole by pleading guilty pursuant to the following provisions: "A defendant may not enter a plea of guilty to the crime of murder in the first degree as defined in section 125.27 of the penal law; provided, however, that a defendant may enter such a plea with both the permission of the court and the consent of the people when the agreed upon sentence is either life imprisonment without parole or a term of imprisonment for the class A-I felony of murder in the first degree other than a sentence of life imprisonment without parole." N.Y. CRIM. PROC. LAW §§ 220.10(5)(e); 220.30(3)(b)(vii). Furthermore, the statute provided, "A defendant who has entered a plea of not guilty to an indictment may, with both the permission of the court and the consent of the people, withdraw such plea at any time before the rendition of a

verdict and enter: (a) a plea of guilty to part of the indictment pursuant to subdivision three or four but subject to the limitation in subdivision five of section 220.10." N.Y. CRIM. PROC. LAW § 220.60(2)(a).

Following petitioner's conviction and sentence to life without parole, the New York Court of Appeals in *Matter of Hynes v. Tomei*, 92 N.Y.2d 613, 620 (N.Y. 1998), *cert. denied*, 527 U.S. 1015 (1999), struck as unconstitutional these statutory provisions allowing defendants to plead guilty to first degree murder with the consent of the prosecutor and the approval of the trial court, because "only those defendants who exercise the Fifth Amendment right against self-incrimination and Sixth Amendment right to a jury trial put themselves at risk of death." *Id.* (citing *United States v. Jackson*, 390 U.S. 570 (1968)). The New York Court of Appeals found the challenged statutory provisions allowing capital defendants to plead guilty to first degree murder–with the consent of the prosecutor and approval of the court–constitutionally indistinguishable from a similar provision of the 1934 Federal Kidnaping Act that the United States Supreme Court held unconstitutional in *United States v. Jackson*, 390 U.S. at 585-86. The Supreme Court stated that by "explicitly provid[ing] two levels of penalty for the same offense, imposing death only on those who assert innocence and proceed to trial," the statute unfairly burdened a defendant's Fifth and Sixth Amendment rights. Similarly, the New York Court of Appeals held in *Matter of Hynes v. Tomei* that New York's plea bargaining restrictions were unconstitutional because they placed an "impermissible burden" on a defendant's exercise of constitutional rights. *Hynes v. Tomei*, 92 N.Y.2d at 624. Under the challenged provisions of the New York Criminal Procedure Law, "only those defendants who exercise  the Fifth Amendment right against self-incrimination and the Sixth Amendment right to a jury trial put themselves at

risk of death," but a defendant who "abandons his right to contest his guilt before a jury is assured that he cannot be executed." *Id.* The unconstitutionality of the statute inhered in its provision of two different punishments for the same crime, with the greater sentence (i.e., execution) reserved for those defendants who asserted their right to proceed to trial. The New York Court of Appeals found the constitutionally offensive provisions severable from the death penalty statute, however.

Turning to Parker's specific claims, he contends that as a result of the constitutionally defective plea bargaining restrictions in existence at the time of his trial, he was denied an option open to every other criminal defendant in New York, the right to plead guilty to the entire indictment. Parker speculates that he been permitted to plead guilty, it would have been possible for him to have received a sentence less than life without parole. As a result of this allegedly disparate treatment, Parker contends, he was deprived of his right to due process and equal protection of the law. Respondent argues that Parker is entitled neither to *vacatur* of his conviction nor to a reduction of his sentence.

First, as respondent points out, the New York Court of Appeals has held that capital defendants, such as Parker, who proceeded to trial and were sentenced prior to the December 22, 1998, decision in *Matter of Hynes v. Tomei* are not entitled to *vacatur* of their first degree murder convictions. *People v. Harris*, 98 N.Y.2d 452, 496 (N.Y. 2002). Rather, "[t]he appropriate remedy [for a *Jackson*/*Hynes* violation] is to vacate[the defendant's] death sentence and to remit his case to [the trial court] . . . for resentencing in accordance with Penal Law §§ 60.06 and 70.00(5)." *Id.* Therefore, Parker is not entitled to *vacatur* of his criminal conviction merely because he proceeded to trial when the unconstitutional sections of the statute were still in effect.

*People v. Harris*, 98 N.Y.2d at 496. Moreover, there is no need to remand Parker's case for resentencing, because he did not receive a death sentence in the first instance. *See id.*; *accord*, *e.g.*, *Parker v. United States*, 400 F.2d 248, 252 (9th Cir. 1968) (reaffirming that only three classes of defendants convicted under the Federal Kidnaping Act who allege a *Jackson* violation can only contest their convictions: defendants who pleaded guilty, defendants who waived a jury trial, and defendants who demanded a jury trial and are now under a sentence of death; petitioner did not come within any of these categories since "he was given a jury trial and is not now under a death penalty"), *cert. denied*, 393 U.S. 1097 (1969). Such is the case with this petitioner. Although he "risked death, [he] . . . suffered no detriment as a result of that risk[,]" and, "[c]onsequently, he cannot now raise the issue as to what might have occurred had the jury recommended death, or what might have happened had he been dissuaded from choosing a jury trial." *Parker v. United States*, 400 F.2d at 252. Moreover, under New York's Penal Law, a sentence of life without parole may also be imposed upon a defendant who pleads guilty. *See Moss v. Artus*, No. 06 Civ. 6178(SAS)(HBP), 2008 WL 544582, at *10 (S.D.N.Y. Feb. 26, 2008) (citing *Holland v. Donnelly*, 216 F. Supp.2d 227 (S.D.N.Y.2002), *aff'd*, 324 F.3d 99 (2d Cir. 2003)). Thus, even if Parker had been offered the chance to plead guilty, he still could have received the same sentence that he received after going through a capital murder trial–that is, a term of life without the possibility of parole. Furthermore, there is no merit to petitioner's claim that because of the *Jackson* defect in New York's death penalty statute, as found by *Hynes v. Tomei*, his sentence of life imprisonment without parole is unconstitutional. *See Corbitt v. New Jersey*, 439 U.S. 212, 217-18 (1978) ("Here, although the punishment when a jury finds a defendant guilty of first-degree murder is life imprisonment,  the risk of that punishment is not

6

completely avoided by pleading *non vult* because the judge accepting the plea has the authority to impose a life term. New Jersey does not reserve the maximum punishment for murder for those who insist on a jury trial."); *contrast with.United States v. Jackson*, 390 U.S. 570, 583 (1970) (""[T]he evil in the federal statute is not that it necessarily *coerces* guilty pleas and jury waivers but simply that it needlessly *encourages* them.") (emphases in original).

The Supreme Court, moreover, has held that not every burden on the exercise of a constitutional right, and not every pressure or encouragement to waive such a right, is invalid; specifically, there is no per se rule against encouraging guilty pleas. In *Corbitt*, the Supreme Court found that the probability or certainty of leniency in return for a *non vult* plea did not invalidate the defendant's mandatory life sentence, there having been no assurances that a plea would have been accepted and if it had been that a lesser sentence would have been imposed. *Id.* (comparing *Bordenkircher v. Hayes*, 434 U.S. 357 (1978)). Even assuming for the sake of argument that Parker had tendered an acceptable plea, and the sentencing court had imposed a term of years less than life, that "would simply have recognized that there had been a plea and that in sentencing it is constitutionally permissible to take that fact into account." *Corbitt*. Given the continuing validity of the Supreme Court cases permitting guilty pleas and plea bargaining, the Constitution does not prohibit the state from extending a "proper degree of leniency in return for guilty pleas," and "New Jersey ha[d] done no more than that." *Id.*

Finally, the defect in New York's statute did not undermine the validity of Parker's life-without-parole sentence on equal protection grounds. *See Corbitt v New Jersey*, 439 U.S. 212, 216-21; *cf. Jackson*, 390 U.S. at 581-83. In *Corbitt*, as in the present case, the statutes at issue provided for mandatory punishment of life imprisonment for defendant convicted by jury of

7

first-degree murder, but also allowed possibility of a sentence of less than life imprisonment for a defendant who enters a plea of *non vult*. All New Jersey defendants were given the same choice as to whether to go to trial or plead guilty *non vult*. Moreover, defendants found guilty by a jury were not penalized for exercising their right to a jury trial any more than defendants who pled guilty were penalized for giving up the chance of acquittal at trial. Similarly, in New York at the time of Parker's trial, a defendant could receive a life-without-parole sentence by pleading guilty to first degree murder, *or* by proceeding to trial on a non-capital first degree murder charge, *or* (like petitioner) by having the jury recommend such a sentence in a capital first degree murder case. *See* N.Y. CRIM. PROC. LAW § 400.27(1); N.Y. PENAL LAW §§ 60.06, 70.00(5). Because the law authorized a sentence of life without parole to be imposed in any of these circumstances, and was not reserved only for defendants who assert their right to proceed to trial, it does not impermissibly infringe upon petitioner's equal protection rights under the Fourteenth Amendment. As the Supreme Court observed in *Corbitt v. New Jersey*, the results of a criminal proceeding "may depend upon a particular combination of infinite variables peculiar to each individual trial. It simply cannot be said that a state has invidiously 'classified' . . . ." *Corbitt*, 439 U.S. at 225-26 (quoting *North Carolina v. Pearce*, 395 U.S. 711, 722 (1969)).

*Robtoy v Kincheloe*, a Ninth Circuit case relied upon by Parker, *see* Petitioner's Memorandum of Law at 30, is distinguishable. As Parker correctly notes, the panel in *Robtoy* invalidated a sentence of life without parole on the basis of the Supreme Court's holding in *Jackson*. However, unlike the situation in New York or in the New Jersey scheme in *Corbitt*, the maximum sentence following a guilty plea was life *with* parole under the applicable statute in *Robtoy*. 871 F.2d 1478, 1480-81 (9th Cir. 1989), *cert. denied sub nom. Robtoy v Callahan*, 494

U.S. 1031, *reh'g denied*, 495 U.S. 966 (1990). In other words, a defendant who pled guilty to first degree murder did not face the potential of a life-without-imprisonment sentence; he only faced such a sentence if he proceeded to trial. *See id.* The Ninth Circuit found that because a life-without-parole sentence could *not* have been imposed if Robtoy had chosen to plead guilty, the statute unfairly burdened the defendant's Fifth and Sixth Amendment rights by penalizing him for pleading not guilty and exercising his right to a jury trial. 871 F.2d at 1481.

Parker also advances the argument that he was denied his constitutional rights to equal protection, a fair trial, and due process of law because, as a result of New York's defective statute, he was denied an opportunity to plead guilty to the entire indictment without the consent of the prosecution or the approval of the court. If the statute had been constitutionally drafted, he contends, it necessarily would have contained provisions under which he theoretically could have pleaded guilty and received an indeterminate sentence that would have made him eligible for parole at some future time.

What the New York Court of Appeals did in *Matter of Hynes v. Tomei* in its discussion of severability makes this argument by petitioner a dead-end. The Court of Appeals explained that "while CPL 220.10(5)(e) and 220.30(3)(b)(vii) relate exclusively to pleas in first degree murder cases and 'needlessly' encourage guilty pleas in violation of *Jackson*, CPL 220.60(2)(a) is not limited to first degree murder cases, nor does it, in the absence of CPL 220.10(5)(e), violate *Jackson*." 92 N.Y.2d at 629. Therefore, only CPL 220.10(5)(e) and 220.30(3)(b)(vii) were required to be stricken. However, the Court of Appeals noted, there was "nothing objectionable in the portion of the two unconstitutional provisions that merely allow[ed] a defendant to plead guilty to first degree murder with the permission of the court and consent of the People . . . ." *Id.*

n. 7. Later, the New York Court of Appeals explained in *Francois v. Dolan*, 95 N.Y.2d 33, 36 (N.Y. 2000), it did not have to strike the death penalty provision wholesale in order to cure the *Jackson* defect. Rather, it could–and did–remedy the statute by striking only the guilty plea provisions and "interpreting the statute as prohibiting a guilty plea to capital murder while such a death notice was pending." *See Matter of Hynes*, 92 N.Y.2d at 629 ("Under the resulting statute, a defendant may not plead guilty to first degree murder while a notice of intent to seek the death penalty is pending."); *see also People v. Parker*, 304 A.D.2d 146, 153, 755 N.Y.S.2d 521, 527 ("In *Hynes*, the Court's solution to the *Jackson* violation was to eliminate the option to plead guilty to first degree murder once a notice of intent to seek the death penalty is pending. Thus, under the post-*Hynes* statutory scheme, it cannot be said that the maximum penalty is reserved for those defendants who exercise the right to trial, inasmuch as defendants against whom a notice of intent to seek the death penalty is pending have no choice but to go to trial. A defendant against whom a notice of intent to seek the death penalty has not been filed or has been filed and then withdrawn may plead guilty to murder in the first degree, and a defendant against whom a notice of intent to seek the death penalty is pending may plead guilty to a lesser crime[.]).

Parker suggests that this prohibition against extending the opportunity to plead guilty to defendants facing capital charges is unconstitutional. However, the Supreme Court has made it clear that a defendant has no constitutionally protected right to enter a guilty plea. *See North Carolina v Alford*, 400 U.S. 25, 39 n. 11 (1970) ("A criminal defendant does not have an absolute right under the Constitution to have his guilty plea accepted by the court."); *accord Lynch v. Overholser*, 369 U.S. 705, 719, 82 S.Ct. 1063, 1072, 8 L.Ed.2d 211 (1962); *Corbitt v. New Jersey*, at 226; *Cf. People v Hansen*, 290 A.D.2d at 56 (noting that there is no fundamental

right to a sentencing jury and that defendants convicted of noncapital first degree murder are not members of a suspect class).

Petitioner submits that there must be a "compelling state justification" for the different treatment of capital and noncapital defendants with respect to the entry of a guilty plea. *See* Petitioner's Memorandum of Law at 32, 33. Respondent counters that a "compelling" justification is not required because the distinction at issue here neither creates a "suspect" classification nor affects a "fundamental right." As respondent correctly notes, "in the absence of a classification affecting fundamental rights or creating suspect classifications which must be invalidated unless justified by some compelling State interest, equal protection requires only that a classification which results in unequal treatment rationally further 'some legitimate articulated state purpose.'" *Matter of Doe v Coughlin*, 71 N.Y.2d 48, 56 (1987), *cert. denied*, 488 U.S. 879 (1988) (quoting *McGinnis v Royster*, 410 U.S. 263, 270 (1973)). If petitioner has not demonstrated that the challenged legislative classification affects a fundamental right or creates a suspect classification, it should follow that he has not shown that the classification should be judged using the highest level of scrutiny. The Court does not believe that Parker, as a defendant accused of and convicted of first degree murder, has demonstrated that he is a member of a suspect class. *See Dickerson v. Latessa*, 872 F.2d 1116, 1119 (1st Cir. 1989) (" We conclude that the 'rational basis test' is the appropriate standard of review in this case. Dickerson does not and could not successfully contend that, as a person convicted of first degree murder, he is a member of a suspect class. *See Williams v. Lynaugh*, 814 F.2d 205, 208 (5th Cir.) (capital defendants not a suspect class for equal protection purposes), *cert. denied*, 484 U.S. 935, 108 S.Ct. 311, 98 L.Ed.2d 270 (1987)); *see also id.* ("Support for use of the "rational basis test" appears in the

Supreme Court's language in cases dealing with access to the appeals process. *See Estelle v. Dorrough*, 420 U.S. 534, 538, 95 S.Ct. 1173, 1176, 43 L.Ed.2d 377 (1975) ( "[T]his Court in dealing with equal protection challenges to state regulation of the right of appeal in criminal cases ha[s] applied the traditional rational-basis test."). *Accord Smith v. Mitchell*, 567 F.3d 246, 262 (6th Cir. 2009) ("Regarding the equal-protection claim, [petitioner] Smith argues that the one-tier system unconstitutionally treats noncapital defendants more favorably than capital defendants with no rational basis for the disparate treatment. The Ohio Supreme Court correctly applied rational-basis review to Smith's claim, following the standard in *Estelle v. Dorrough*, 420 U.S. 534, 539, 95 S.Ct. 1173, 43 L.Ed.2d 377 (1975).").

Federal courts have employed the rational basis test and denied equal protection challenges brought by capital defendants alleging that they were treated differently than noncapital defendants. *E.g.*, *Dickerson v. Latessa*, 872 F.2d at 1119; *Smith v. Mitchell*, 567 F.3d at 262. To pass muster under the less stringent "rational relationship" test, a legislative classification "must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920). In *Smith*, the capital defendant argued that the one-tier-only system of direct appellate review of capital cases was unconstitutional because it treated noncapital defendants more favorably than capital defendants with no rational basis for the disparate treatment. The Sixth Circuit held that the Ohio Supreme Court properly applied rational-basis review to Smith's claim, following the standard in *Estelle v. Dorrough*, 420 U.S. at 539. The Sixth Circuit found that the Ohio Supreme

Court's articulated rationale[1] for treating capital defendants differently than noncapital

defendants was not contrary to or an unreasonable application of clearly established federal law.

*Id.*

Under this second-tier level scrutiny called for by the "rational basis" test, "a State does

not violate the Equal Protection Clause merely because the classifications made by its laws are

imperfect." *Danridge v. Williams*, 397 U.S. 471, 485 (1970). The petitioners in, *e.g.*, *Smith* and

*Dickerson* essentially were arguing that because "[d]eath is different," capital defendants should

be provided more process than noncapital defendants[,]" *Smith*, 567 F.3d at 562 (quotation

omitted; alteration in original). Undoubtedly, the death penalty is "unique in its severity and

irrevocability[.]" *See*, *e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). The New York

Legislature, in declining to allow guilty pleas to capital crimes, is in a way affording capital

defendants more process rather than less: By not allowing those accused of capital crimes and

facing the ultimate penalty to plead guilty, the statute ensures that these defendants will not

waive any of the significant constitutional rights guaranteed to criminal defendants–e.g., to have

their guilt proven beyond a reasonable doubt by the State in front of an impartial judge and jury–

and will not permit the prosecutor to become an unwitting participant in a State-assisted suicide.

This Court cannot say that such a distinction is irrational given the seriousness and finality of a

death sentence. Accordingly, Parker has not demonstrated abridgement of his right to equal

treatment under the law.

---

[1]        "In addition, defendants sentenced to imprisonment are usually already serving their terms and
have a great interest in expediting their appeals. Capital defendants, on the other hand, while seeking to overturn
their convictions, also seek to prolong the appeal process as long as possible, using every conceivable avenue of
attack, and the statistics show they have been extremely successful in Ohio." *Smith*, 684 N.E.2d at 682.

## B. Unconstitutionality of the "Death Qualification" Aspect of Jury Selection Under New York's Death Penalty Statutory Scheme

Parker contends that New York's death penalty law is unconstitutional in that it requires that jurors be "death-qualified" prior to commencement of the guilt phase of a capital trial.[2]  In New York, a jury that is to hear a capital case is subjected to "death qualification" and "life qualification"[3] prior to the commencement of the guilt phase of the trial, meaning that prospective jurors whose views on the death penalty are such that "they would be committed, before trial has begun, to vote either for or against the death penalty, regardless of facts that might emerge in the course of the proceedings, are excludable for cause." *People v. Harris*, 98 N.Y.2d 452, 477 (N.Y. 2002); *see also Witherspoon v. Illinois*, 391 U.S. 510, 522-23 ("[W]e hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction.  No defendant can constitutionally be put to death at the hands of a tribunal so selected.") (footnotes omitted), *reh'g denied*, 393 U.S. 898 (1968); *see also Wainwright v. Witt*, 469 U.S. 412, 421-24 (1985).

---

[2]    I note that the New York Court of Appeals declared the state's death penalty scheme to be facially invalid in 2004, two years after Parker's conviction. *See People v. Taylor,* 9 N.Y.3d 129, 148, 878 N.E.2d 969, 978, 848 N.Y.S.2d 554, 563  (N.Y. 2007) ("*People v. [LaValle,* 3 N.Y.3d 88, 783 N.Y.S.2d 485, 817 N.E.2d 341 (2004)] made perfectly clear that the death penalty sentencing statute crafted by the [New York] Legislature was unconstitutional. That judgment stemmed from *LaValle*'s core holdings that our Due Process Clause requires an anticipatory deadlock instruction be given and that the existing provision was unconstitutionally coercive. Since we could not craft a new instruction, we were constrained to say: 'under the present statute, the death penalty may not be imposed[.]'") (quoting *LaValle,* 3 N.Y.2d at 131, 783 N.Y.S.2d 485, 817 N.E.2d 341)

[3]    "Death qualification" is supposed to ensure that prospective jurors are able to consider the death penalty; "life qualification" is intended to ensure that prospective jurors can consider a life sentence. *People v. Harris,* 98 N.Y.2d at 477-78 (citing *Lockhart v. McCree,* 476 U.S. 162, 175 (1986); *Morgan v. Illinois,* 504 U.S. 719, 735-36 (1992)).

Parker argues that by requiring "death qualification" of jurors prior to trial, New York's statute denied him due process and the right to an impartial and representative jury, and produced a jury that was more likely to find him guilty. Petitioner also contends that death qualification generally is unconstitutional because it leads to juries inherently biased in favor of the death penalty.

The United States Supreme Court concluded in *Lockhart v. McCree,* 476 U.S. 162 (1986), that even assuming for purposes of *McCree* that defendant's proffered studies were both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries, "nonetheless, . . . the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." 476 U.S. at 173. Thus, the Supreme Court in *McCree* rejected the circuit court's attempt to broaden the application of the fair-cross-section requirement to invalidate the use of either for-cause or peremptory challenges to prospective jurors, or to require petit juries, as opposed to jury panels or venires, to reflect the composition of the community at large. *Id.* at 173 (citing *Duren v. Missouri*, 439 U.S. 357, 363-64 (1979); *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975)). According to the *McCree* court, "the Constitution presupposes that a jury selected from a fair cross section of the community is impartial, regardless of the mix of individual viewpoints actually represented on the jury, so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." 476 U.S. at 183

Subsequently, the New York Court of Appeals relied upon *McCree* to uphold the constitutionality of C.P.L. § 270.20(1)(f), which provides for pre-trial "death qualification" of jurors in capital cases. *People v. Harris*, 98 N.Y.2d at 480 (citing *Lockhart v. McCree*, 476 U.S.

at 175-76). Respondent points out that the defendant in *Harris* raised the same claims raised by Parker here–that the statutory death-qualification would result in a "conviction prone" jury and would disproportionately exclude certain cognizable groups from the venire, in violation of State and Federal constitutional guarantees of a fair and impartial jury. *Id.* at 478. The New York Court of Appeals in *Harris* found that the defendant had "failed to overcome the presumption of constitutionality with respect to CPL 270.20(1)(f)," noting that "death qualification" at the beginning of a trial was "designed to serve the State's 'concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial.'" *Id.* at 478 (quoting *Lockhart v McCree*, 476 U.S. at 175). The *Harris* court also rejected the claim that New York's Constitution required a greater degree of protection than that contemplated by the Sixth Amendment of the federal Constitution and the Supreme Court's holding in *Lockhart*. *Id.* at 480. For the foregoing reasons, Parker's contention does not warrant habeas relief.

## C. Errors During Jury Selection

Parker argues that the trial failed to adhere to the requirements of New York Criminal Procedure Law §§ 270.20(1)(b) and 270.20(1)(f)[4] and erroneously denied his challenges for cause to eight prospective jurors. Parker also contends that the trial court also erred in refusing to grant him additional peremptory challenges, which led to him being forced to accept as a juror Barbara Sekuterski, whom he had unsuccessfully challenged for cause. As a result of

---

[4]     In New York, C.P.L § 270.20(1)(f) allows a challenge for cause on the ground that "[t]he crime charged may be punishable by death and the prospective juror entertains such conscientious opinions either against or in favor of such punishment as to preclude such juror from rendering an impartial verdict or from properly exercising the discretion conferred upon such juror by law in determination of a sentence pursuant to sections 400.27 [of the Criminal Procedure Law]."

these errors, Parker contends, he was denied his right to due process and to a fair and impartial jury under the United States Constitution's Sixth and Fourteenth Amendments, and under New York Civil Rights Law § 12 and New York Criminal Procedure Law § 270.20(1)(b).

1.     **Erroneous Denial of Challenges for Cause with Regard to Eight Jurors**

The Sixth Amendment, which is made applicable to the States by the Fourteenth Amendment, guarantees a criminal defendant the right to trial by an impartial jury. *Duncan v Louisiana*, 391 U.S. 145, 159 (1968). The Supreme Court has expressly held that the an erroneous denial of a for-cause challenge of a juror does not amount to a constitutional infirmity unless the challenged juror is actually seated on the defendant's jury. *Ross v. Oklahoma*, 487 U.S. 81, 89-91 (1988); *United States v. Martinez-Salazar*, 528 U.S. 304, 308 (2000). With regard to eight of the prospective jurors, Parker was able to exercise peremptory challenges against them, and they were *not* seated on the jury. In such circumstances, even an erroneous ruling on a challenge for cause cannot  result in reversal. *See Martinez-Salazar*, 528 U.S. at 308. As the Second Circuit has explained, "[S]o long as the jury which was ultimately selected was fair and impartial, the fact that the defendant had to use a peremptory challenge to achieve that result does not mean that the sixth amendment was violated." *United States v. Towne*, 870 F.2d 880, 885 (2d Cir.1989) (citing  *Ross v. Oklahoma*, 487 U.S. at 88). Here, none of the eight jurors whom petitioner contends should have been subject to for-cause challenges was seated on the jury. Instead, after the court denied petitioner's for-cause challenges, he challenged them peremptorily. Because none of the challenged jurors actually sat on the jury, and because petitioner does not allege that any of the jurors sitting on the jury were biased, petitioner is not entitled to habeas

relief. *Accord, e.g.*, *Cunningham v. Bennett*, No. 02 CV 4635(ARR), 2005 WL 1162475, at *5 (E.D.N.Y. May 16, 2005).

In addition, Parker may not assert a constitutional violation based on an alleged loss of peremptory challenges resulting from the trial court's denial of his challenges for cause. The Supreme Court has "rejected the notion that the loss of a peremptory challenge constitutes a violation of the constitutional right to a impartial jury." *Ross*, 487 U.S. at 88. Because peremptory challenges are "not of constitutional dimension," the fact that petitioner had to use a peremptory challenge to achieve an impartial panel of juror does not mean that the Sixth Amendment was violated. *United States v. Rubin*, 37 F.3d 49, 54 (2d Cir. 1994); *see also Hopt v. Utah*, 120 U.S. 430, 436 (1887). Parker therefore cannot successfully claim that he was deprived of his Sixth Amendment or due process rights in connection with the trial court's denials of his for-cause challenges to several members of the jury pool.

### 2. Erroneous Denial of Additional Peremptory Challenges

Parker contends that the trial court also erred in refusing to grant him additional peremptory challenges, which led to him being "forced" to accept a juror whom he had unsuccessfully challenged for cause. However, the Supreme Court has clearly held that peremptory challenges are not a constitutional entitlement in and of themselves; they are only a means of ensuring an impartial jury. *Holland v. Illinois*, 493 U.S. 474, 480 (1990); *see also Ross v. Oklahoma*, 487 U.S. at 89.

The number of challenges is left to be regulated by the common law or the enactment of Congress. *Stilson v. United States*, 250 U.S. 583 (1919). The matter of peremptory challenges rests entirely with the Legislature which has clearly limited the number by the crime charged and

not by the potential penalty, the severity of the crime or the potential pre-trial publicity. Since peremptory challenges are a creature of statute and not constitutionally required, it is for the state to determine their number and to define their purpose and the manner of their exercise. *Ross v. Oklahoma*, 487 U.S. at 82. When a defendant in New York State is charged with any Class A felony, C.P.L. §270.25(2)(a) allows for twenty peremptory challenges for regular jurors and two peremptories for each alternate juror selected. N.Y. CRIM. PROC. LAW § 270.25(2)(a) ("Each party must be allowed the following number of peremptory challenges: (a) Twenty for the regular jurors if the highest crime charged is a class A felony, and two for each alternate juror to be selected."). "[T]he 'right' to peremptory challenges is 'denied or impaired' only if the defendant does not receive that which state law provides." *Ross*, 487 U.S. at 89. Parker's due process challenge must fail, since he received the number of peremptory challenges to which he was entitled under New York State law. *Accord, e.g., Willoughby v. Perlman*, No. 03 Civ.3345 DLC FM, 2004 WL 2525883, at *4-*5 (S.D.N.Y. Oct. 28, 2004) ("[Petitioner] Willoughby also was not deprived of any Fourteenth Amendment due process rights. . . . In this case, Section 270.52 of the New York Criminal Procedure Law sets forth the procedures for peremptory challenges. Willoughby does not allege that he received fewer peremptory challenges than state law allows. Because he has failed to demonstrate that he was deprived of the statutorily-prescribed number of challenges, there has been no due process violation in this case."), *report and recommendation adopted by Willoughby v. Perlman*, No. 03 Civ.3345DLC, 2005 WL 1189547 (S.D.N.Y. May 17, 2005).

3.      **The Trial Court Allegedly "Forced" Petitioner to Seat Juror Sekuterski**

In using his last peremptory challenge, petitioner faced a choice between juror Sekuterski and another prospective juror. Defense counsel opted to use the peremptory against the other juror and Sekuterski was sworn in on the panel. The Appellate Division rejected Parker's contention "that he was 'forced' to accept a certain prospective juror [as] without merit." *People v. Parker*, 304 A.D.2d 146, 153, 755 N.Y.S.2d 521, 528. Relying on the Supreme Court's statement in *United States v. Martinez-Salazar* that "[a] hard choice is not the same as no choice," 528 U.S. 304, 315, the Appellate Division could not conclude that Parker was "forced" to accept the prospective juror at issue.

The Appellate Division further rejected Parker's characterization of the individual whom he was purportedly "forced" to seat as an "incompetent juror." *Parker*, 304 A.D.2d at 153. The Appellate Division found that the juror's statements, "'taken in context and as a whole, were unequivocal' that she could be impartial[.]" *Id.* (quoting *Chambers*, 97 N.Y.2d at 419). Although Parker states in his reply memorandum of law that Sekuterski was "incompetent," Pet'r Reply Mem. at 35, 36, he tellingly does not provide any particulars as to why she was "incompetent" or how her presence on the jury prejudiced him. On habeas review, a state court's factual findings are entitled to a presumption of correctness which the habeas petitioner bears the burden of overcoming by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Furthermore, a state court's determination as to a juror's impartiality may only be overturned in the case of "manifest error." *Patton v. Yount*. Parker has not met his burden of proof with regard to establishing that the state courts improperly allowed juror Setkurski to be seated on his jury.

**D.      Sixth Amendment "Fair Cross-Section" Challenge to the Jury Pool**

**1.      Factual Background**

By motion dated July 6, 1998, defense counsel moved for an order discharging the jury panel on the grounds that it failed to conform with New York's Judiciary Law and was not representative of the community in which petitioner resided. The trial court then conducted a hearing at which the Erie County Commissioner of Jurors testified. The commissioner stated that the procedures utilized in compiling lists of prospective jurors complied with the rules set forth by New York Judiciary Law §§ 500-527, which were designed to reach a broad and fair cross-section of the community. The commissioner noted that the jury selection procedure utilized a variety of sources to obtain names of prospective jurors; the juror questionnaire is mailed to individuals culled randomly from those source lists; and the questionnaire does not discriminate among prospective jurors. Following the hearing, the trial court denied petitioner's request, subject to renewal at a later time. The trial court ruled that the compilation of prospective jurors was proper in all respects, that the source lists from which the persons were compiled provided a fair cross-section of persons in the community, and the procedures employed by the Commissioner of Jurors did not systematically exclude any recognizable group. *See* JS1 at 61.[5] Defense counsel renewed his motion during jury selection, alleging that there was now evidence of a systematic exclusion of African-Americans from the jury panel.

The trial court denied the motion to challenge the jury panel. On direct appeal, the Appellate Division affirmed the denial of the fair cross-section claim. Parker contends that he is entitled to habeas relief because he did make a sufficient showing to merit discharge of the jury panel.

**2.      The Sixth Amendment Right to a Jury Drawn from a Fair Cross-Section of**

---

[5]      "JS1 at __" refers to pages of the Jury Selection transcript, Volume I, dated July 6, 1998.

the Community

The Sixth Amendment has been interpreted to require that a jury be selected from a representative cross-section of the community. *Taylor v Louisiana*, 419 U.S. 522, 526-27 (1975) ("Both in the course of exercising its supervisory powers over trials in federal courts and in the constitutional context, the [Supreme] Court has unambiguously declared that the American concept of the jury trial contemplates a jury drawn from a fair cross section of the community."). In *Duren v Missouri*, 439 U.S. 357 (1979), the Supreme Court instituted a three-part test for jury challenges. *Berghuis v. Smith*, __ U.S. __, 130 S. Ct. 1382, 1392 (2010) ("*Smith*"). To establish a *prima facie* case for violation of the fair cross-section requirement under the Sixth Amendment, "a defendant must prove that: (1) a group qualifying as 'distinctive; (2) is not fairly and reasonably represented in jury venires, and (3) 'systematic exclusion' in the jury selection process accounts for the underrepresentation." *Smith*, 130 S. Ct. at 1392 (citing *Duren*, 439 U.S. at 364); *see also People v. Guzman*, 60 N.Y.2d 403, 410 (N.Y. 1983) (*per curiam*) (" In order to establish a violation of due process based on the absence of a fair cross section of the community in the jury pool, a defendant must demonstrate that a substantial and identifiable segment of the community was not included in the Grand Jury pool because the process used to select grand jurors "systematically excluded" that group from service[.]" (citing *Peters v. Kiff*, 407 U.S. at 503-504,  *Duren v. Missouri*, 439 U.S. at 364), *cert. denied*, 466 U.S. 951 (1984).  A defendant does not have to prove this underrepresentation was caused by *intentional* discrimination. *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir. 1990) (agreeing with district court that "discriminatory intent is not an element of a Sixth Amendment 'fair cross-section' claim"), *cert. denied*, 499 U.S. 904 (1991)). "Once the defendant has established a *prima facie* case, the burden

then shifts to the government to show that 'a significant state interest [is] manifestly and primarily advanced by those aspects of the jury selection process . . . that result in the disproportionate exclusion of a distinctive group.'" *Smith v. Berghuis*, 543 F.3d at 336 (quoting *Duren*, 439 U.S. at 367-68) (alteration in *Smith*)).

In *Smith*, an African-American defendant in Michigan's Kent County Circuit Court challenged his all-white jury on Sixth Amendment grounds. 543 F.3d at 330. The defendant claimed that two specific jury-selection practices caused African-Americans to be underrepresented in circuit-court juries. First, the jury system allowed prospective jurors who lacked transportation, had child-care concerns, or could not take time away from work, to be excused from jury service. *Id.* at 331.

As to the proper statistical method for demonstrating underrepresentation, the Sixth Circuit ruled that where the allegedly excluded group (in Smith's case, African-Americans) is small, a court is required to use the comparative disparity test. *Smith*, 543 F.3d at 338. Examining the data presented by the petitioner, the Sixth Circuit explained that since 64% of the county's African-American households were headed by single parents (compared to 19% for whites/Caucasians), and 31.5% of African- Americans lived below the poverty line (compared to 6.7% of whites/Caucasians), a disproportionate number of excused jurors were African-American. *Id.* at 333. The county's jury system also utilized a practice of assigning prospective jurors from its largest city, Grand Rapids, to district courts first, while the circuit courts received jurors from Grand Rapids only after district-court venires were filled. *Id.* at 331-32. The petitioner in *Smith* produced census data showing that African-Americans formed 18.1 % of the jury-eligible population in Grand Rapids, but accounted for only 7.8% of the jury-eligible

population in the rest of Kent County. In addition, 85% of Kent County's African-American

residents lived in Grand Rapids, even though the city represented only 37% of the county's

population. *Id.* at 330. Therefore, the systematic practice of allocating jurors from Grand Rapids

in priority to the district courts concentrated minority jurors in these courts, rendering

circuit-court juries, by comparison, unrepresentative of minorities. *Id.* at 332.

      The Sixth Circuit held that both these practices violated the Sixth Amendment's fair

cross-section requirement:

> The introduction of non-random factors into a jury selection process has been
> found to support an inference of systematic exclusion. *See, e.g.*, *United States v.
> Young*, 822 F.2d 1234, 1239 (2d Cir.1987); *United States v. Osorio*, 801 F. Supp.
> 966, 978 (D. Conn.1992). The lack of random selection in the Kent County jury
> selection process leads us to conclude that the underrepresentation of African
> Americans resulted from processes "inherent in the particular jury-selection
> process utilized."

*Smith*, 543 F.3d at 341 (quoting *Duren*, 439 U.S. at 366) (footnote omitted). The Sixth Circuit

also found that the Michigan Supreme Court had unreasonably applied *Duren v. Missouri*, 439

U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979), when it declared that social and economic factors

could not establish systematic exclusion. 543 F.3d, at 341-342. Because such factors

disproportionately affect African-Americans, the Sixth Circuit determined, Kent County's

routine grants of certain hardship exemptions "produced systematic exclusion within the meaning

of *Duren*."   The Sixth Circuit first held that Kent County's (1) practice of allowing jurors to be

excused at the summons stage based on childcare, transportation and employment concerns, and

(2) practice of giving the district courts priority-of-assignment with regard to jurors (referred to

as "siphoning") constituted "non-random factors" inherent in the jury-selection process which

contributed to the systematic underrepresentation of African-Americans in circuit-court juries. *Id.* at 344.

The Sixth Circuit ruled, however, that the hardship exemptions could not establish a fair cross-section claim because the State "has a significant interest [in] avoiding undue burdens on individuals" by allowing such excuses. *Id.* at 345. With regard to the juror-assignment order in effect when Smith's jury was empaneled, the Sixth Circuit found that it significantly reduced the number of African-Americans available for Circuit Court venires, *id.*, at 342, and Smith was entitled to relief because no important state interest supported that allocation system, *id.*, at 345. In other words, although the Sixth Circuit found systematic exclusion occurring in two ways in the Kent County jury system (i.e., through hardship exemptions and by means of the juror-assignment order that resulted in "siphoning" minority jurors to one court to the exclusion of others), it only granted relief on latter ground.

The Supreme Court granted *certiorari* in *Smith* on two main issues urged by the State. First, the State argued that the Sixth Circuit erred in adopting the comparative disparity test to determine whether a distinctive group was underrepresented in the jury pool. Second, according to the State, there was no systematic exclusion of African-Americans from juries in Kent County, Michigan, and the Sixth Circuit's contrary determination was unwarranted. Earlier this year, the Supreme Court reversed the Sixth Circuit's grant of habeas corpus relief in the *Smith* case. The Supreme Court's decision in *Smith* is discussed further, *infra*, in the context of the second and third prongs of the *Duren* test.

Although one of the questions presented in the State's petition for *certiorari* "home[d] in on the proper measure for underrepresentation," *Smith*, 130 S. Ct. at 1392 n.3, the Supreme Court

instead addressed what it found to be the "overarching issue," *id.*, "initially and more comprehensively," *id.*, asked in the petition of "[w]hether the U.S. Court of Appeals for the Sixth Circuit erred in concluding that the Michigan Supreme Court failed to apply 'clearly established' Supreme Court precedent under 28 U.S.C. § 2254 on the issue of the fair cross-section requirement under *Duren* . . . ," *id.*  The Supreme Court disagreed with the Sixth Circuit's holding that the state appellate court's rejection of Smith's Sixth Amendment claim "involved an unreasonable application o[f] clearly established Federal law, as determined by [this Court in *Duren*]." *Id.* at 1392 (citing 28 U.S.C. § 2254(d)(1) and *Smith*, 543 F.3d, at 345; alteration in Supreme Court's *Smith* decision). Justice Ginsburg, writing for a unanimous court, held that "*Duren* . . . hardly establishe[d]–no less 'clearly' so–that Smith was denied his Sixth Amendment right to an impartial jury drawn from a fair cross section of the community." 130 S. Ct. at 1392.

### 3.     Application of the Three-Part *Duren* Test to Parker's Case

#### a.     African-Americans as a "distinctive group" in the community

Parker alleges that African-Americans are unfairly underrepresented in the jury venire in Erie County. "Distinctive groups" under the Sixth Amendment are those that "are sufficiently numerous and distinct" that if they are systematically excluded from jury venires, "the Sixth Amendment fair-cross-section requirement cannot be satisfied." *Duren v. Missouri*, 439 U.S. at 364 (quoting *Taylor v. Louisiana*, 419 U.S. 522, 531 (1975)). Federal courts have held that African-Americans, Hispanics, and women do constitute "distinctive groups" within the meaning of the Sixth Amendment. *E.g., Castaneda v Partida*, 430 U.S. 482, 494 (1977) (citations omitted); *Peters v. Kiff*, 407 U.S. 493 (1972); *United States v. Jackman*, 46 F.3d 1240 (2d Cir. 1995). There is no debate that Parker can fulfill the "distinctive group" part of the *Duren* test.

## b. Fairness and reasonableness of representation of the group

The second prong of the *Duren* test requires that Parker show that representation of African-Americans in Erie County's jury selection process is not fair and reasonable in relation to the number of persons in the community. At the outset in *Smith*, the Supreme Court rejected the notion that adoption of the "comparative disparity" test was constitutionally required where the "distinctive group" is small in number: "[N]either *Duren* nor any other decision of th[e] [Supreme] Court specifies the method or test courts must use to measure the representation of distinctive groups in jury pools." *Smith*, 130 S. Ct. at 1393 (noting the three methodologies that had been brought to its attention as having been utilized by the lower federal courts in Sixth Amendment fair cross-section claims: the absolute disparity,[6] comparative disparity (discussed above in this Decision and Order), and standard deviation) (citations omitted).

_____

[6] The Second Circuit has explained the mechanics of the "absolute numbers" statistical method as follows:

> The absolute numbers approach is a measure of the degree of underrepresentation accomplished by determining how many individuals from the distinctive group would have to be added to a randomly drawn venire to make that venire representative with respect to the excluded or underrepresented group. *See Jenkins*, 496 F.2d at 65. The analysis involves two steps. First, the Court must calculate "the difference between a group's proportion of the population and its proportion in the relevant jury pool." *United States v. Gerena*, 677 F. Supp. 1266, 1271 (D. Conn.1987), *aff'd sub nom. United States v. Maldonado-Rivera*, 922 F.2d 934 (2d Cir. 1990), *cert. denied*, 501 U.S. 1211 (1991). Next, that percentage difference is multiplied by the size of a typical venire in order to determine the number of individuals from the distinctive group that have to be added to the venire, on average, to redress the group's underrepresentation. *Id.*

*United States v. Jackman*, 46 F.3d 1240, 1247 n.4 (2d Cir. 1995). *See also, e.g., United States v. Royal*, 174 F.3d 1, 6-7 (1st Cir. 1999) ("Absolute disparity measures the difference between the percentage of members of the distinctive group in the relevant population and the percentage of group members on the jury wheel.").

> The State in *Smith* demanded adoption of the absolute-disparity standard for measuring fair and reasonable representation, with a requirement that such disparity be proved to exceed 10 percent in order to make out a *prima facie* fair cross-section violation. 130 S. Ct. at 1394 n.4 (citation omitted). Defendant Smith countered that where the relevant population of the distinct group falls below this 10 percent threshold, the rule proposed by the State would allow no remedy under the Sixth Amendment for completely excluding distinct groups in communities. *Id.* The Supreme Court stated that it "need not reach that issue." *Id.*

27

The Supreme Court in *Smith* observed that the Michigan appellate court, on direct review, did not select a single method to measure whether representation of a distinctive group was fair and reasonable, but rather adopted a case-by-case approach. The state appellate court noted that so long as the parties "'proffer[ed] sufficient evidence . . . the results of all of the tests [should be considered].'" *People v. Smith*, 463 Mich. 199, 204, 615 N.W.2d 1, 3 (Mich. 2000) (quoted in *Smith*, 130 S. Ct. at 1393). "In contrast, the Sixth Circuit declared that '[w]here the distinctive group alleged to have been underrepresented is small, as is the case here, the comparative disparity test is the more appropriate measure of underrepresentation.'" *Smith*, 130 S. Ct. at 1393 (quoting *Smith*, 543 F.3d at 338). The Supreme Court's language signals to this Court a disapproval of the Sixth Circuit's approach of only utilizing one statistical model. In any event, the Supreme Court made clear its unwillingness to enter the debate on the proper statistical model to use, stating that "[e]ven in the absence of AEDPA's constraint, . . . , we would have no cause to take sides today on the method or methods by which underrepresentation is appropriately measured." *Smith*, 130 S. Ct. at 1393-94 (internal citation omitted; footnote omitted).

It does not appear that the New York State courts have adopted a specific statistical method for proving underrepresentation in fair cross-section claims, although at least one court has found that merely comparing racial disparity between the jury panel and the demographic characteristics of the county is insufficient. *People v. Tucker*, 115 A.D.2d 175, 176, 495 N.Y.S.2d 244 (N.Y. App. Div. 3d Dept. 1985) ("Defendant's application, supported as it was only by a comparison of the demographics of Albany County with the jury panel, was properly denied."), *appeal denied*, 67 N.Y.2d 766 (N.Y. 1986). *See also People v. Parks*, 41 N.Y.2d 36,

44 (N.Y. 1976) ("The undisputed proof in this case established that, generally, women constituted at least 33% of the prospective jurors in Nassau County. Even granted the fact that women constitute a majority [presumably, 51%] of the population in Nassau County and that a number, therefore, did exercise the exemption accorded by statute, a very substantial number of women did participate on county jury panels.") (citing *People v. Sibila*, 81 Misc.2d 80, 80-81, 365 N.Y.S.2d 133 (N.Y. County Ct. 1975); footnote omitted)). In Parker's case, defense counsel submitted only general census data for Erie County for the year 1990, and sought to show unfair and unreasonable underrepresentation by comparing the general population of African-Americans in the county to the percentage of African-Americans in the jury venire for Parker's trial.

In any event, Parker's motion challenging the jury panel did not identify the statistical model upon which he was relying, although it appears that he generally was utilizing the "absolute numbers" or "absolute disparity" approach. *See*, *e.g.*, *United States v. Rioux*, 97 F.3d 648, 657 (2d Cir. 1996).[7] Interestingly, while the Sixth Circuit in *Smith* found the comparative

---

[7] In *United States v. Rioux*, the Second Circuit, on direct review, elected to apply the absolute numbers approach. In *United States v. Jenkins*, it had adopted the absolute numbers method of analysis to examine a challenge to a jury selection system under the JSSA. Jenkins, 496 F.2d at 66. Later, in a pre-AEDPA habeas case, *Alston v. Manson*, 791 F.2d 255 (2d Cir.1986), *cert. denied*, 479 U.S. 1084, 107 S.Ct. 1285, 94 L.Ed.2d 143 (1987), the Second Circuit criticized the *Jenkins* absolute numbers approach in *dicta* and selected the statistical decision theory ("SDT") to assess a Fourteenth Amendment equal protection challenge to a jury selection system. Notwithstanding the suggesting in *Alston* to use SDT for Sixth Amendment challenges, the Second Circuit later returned to the absolute numbers analysis in *United States v. Biaggi*, 909 F.2d 662, 678 (2d Cir.1990), cert. denied, 499 U.S. 904, 111 S.Ct. 1102, 113 L.Ed.2d 213 (1991) (citing *United States v. Rosario*, 820 F.2d 584, 585 & n. 1 (2d Cir.1987), and *Anderson v. Casscles*, 531 F.2d 682, 685 & n. 1 (2d Cir.1976)). The *Biaggi* court concluded that absolute disparities of 3.6% for Blacks and 4.7% for Hispanics, which would have required an additional two Blacks and two or three Hispanics to the venire of 60 people, did not amount to unfair underrepresentation for Sixth Amendment purposes. *Biaggi*, 909 F.2d at 677-78. The Second Circuit "conceded, however, that the *Biaggi* fact pattern 'press[ed] the *Jenkins* "absolute numbers" approach to its limit.'" *Rioux*, 97 F.3d at 656. It reiterated that the absolute numbers/absolute disparity method was of "questionable application" when the minority population was a "tiny percentage of the entire population.'" *Id.* (quoting *Biaggi*, 909 F.2d at 678). The *Rioux* noted that it "'would find the Sixth Amendment issue extremely close if the underrepresentations had resulted from any circumstances less benign than use of voter registration lists' to compile the jury wheel." *Id.* (quoting *Biaggi*, 909 F.2d at 678).

disparity to be most appropriate, the Second Circuit stated in *Rioux* that it had earlier considered

and rejected the comparative disparity test, and saw "no reason to revisit the issue." *Id.* (citing

*United States v. Jenkins*, 496 F.2d 57, 65-66 (2d Cir.1974), *cert. denied*, 420 U.S. 925 (1975)).

Although it chose the absolute disparity test, it did so with the caveat that the "absolute

numbers/absolute disparity method was of questionable application when the minority population

is a tiny percentage of the entire population." *Rioux*, 97 F.3d at 656. Similarly, the Supreme

Court recognized in *Smith* that both tests are "imperfect" since both absolute disparity and

comparative disparity measurements "can be misleading when, as here, 'members of the

distinctive group comp[ose] [only] a small percentage of those eligible for jury service.'" *Id.*

(quoting *Smith*, 463 Mich., at 203-204, 615 N.W.2d, at 2-3) (alterations in Supreme Court's

decision).[8]

     In Parker's case, as noted, the only data submitted was the general census data for Erie

County and racial composition of the jury venire for Parker's trial. Although the Court doubts

that this is sufficient data on which a statistically significant underrepresentation can be shown,

the Court nonetheless will attempt to apply the absolute and comparative tests using what

---

     A year prior to *Rioux*, however, the Second Circuit had spurned the absolute disparity analysis in *United States v. Jackman*, 46 F.3d 1240, 1247 (2d Cir. 1995). The Second Circuit explained it had done so because "because the[,]" reiterating its concern that the absolute disparity approach was acceptable only because the skewed minority representation resulted from something as "benign as the use of voter registration lists to construct the jury wheel." *Rioux* distinguished *Jackman* "because the selection practices at issue there (a system that excluded whole towns with significant minority populations) were hardly benign." Finally, the Second Circuit found in *Jackman* that there "were insufficient data to conclude whether the absolute numbers analysis revealed a statistically significant underrepresentation."

     [8]     "No court . . . has accepted [a standard deviation analysis] alone as determinative in Sixth Amendment challenges to jury selection systems." *Smith*, 130 S. Ct. at 1393 (quoting *United States v. Rioux*, 97 F.3d at 655) (alteration in *Smith*).

information has been provided. As respondent points out, petitioner's figures purport to show that 7.68% of the jury pool of 820 individuals was African-American. The population of African-Americans over the age of eighteen years, per the 1990 Erie County census figures, appears to be 11 percent. Using the absolute numbers approach, these figures yield a disparity of 3.32% (11% - 7.68%).

The Court turns next to application of the comparative disparity approach; although the Second Circuit has rejected this approach, it was not ruled out as an option by the Supreme Court's recent decision in *Smith*. Comparative disparity is a measurement of "the diminished likelihood that members of an underrepresented group, when compared to the population as a whole, will be called for jury service." *Ramseur v. Beyer*, 983 F.2d 1215, 1231-32 (3d Cir.1992), *cert. denied*, 508 U.S. 947 (1993) (quoted in *United States v. Rioux*, 97 F.3d at 655). As the Second Circuit explained in *Rioux*, "[c]omparative disparity is calculated by dividing the 'absolute disparity' of a group . . . by the group's percentage of the population, and then multiplying by 100%." 97 F.3d at 655.

In Parker's case, using the figures yielded in the paragraph above discussing absolute disparity, one arrives at a comparative disparity of 30.18% (3.32% divided by 11% multiplied by 100). The Supreme Court observed in *Smith* that lower federal courts have found similar figures insufficient to establish that any underrepresentation of a minority group was unreasonable and unfair. *Smith*, 130 S. Ct. at 1394 n. 5 (citing *United States v. Orange*, 447 F.3d 792, 798-799, and n. 7 (10th Cir. 2006) (absolute disparity of 3.57%; comparative disparities "rang[ing] from 38.17% to 51.22%"); *United States v. Royal*, 174 F.3d 1, 10 (1st Cir. 1999) (2.97% absolute disparity; 61.1% comparative disparity); *United States v. Rioux*, 97 F.3d at 657-58 (1.58% and

2.08% absolute disparities for petit and grand juries, respectively; 29% comparative disparity); *State v. Gibbs*, 254 Conn. 578, 591-593, 758 A.2d 327, 337-338 (2000) (2.49% absolute disparity; 37% comparative disparity)).

In this Court's opinion, the figures discerned from Parker's motion challenging the jury panel suggest that African-Americans may well be disproportionately underrepresented in the Erie County jury selection system. However, those figures only purported to show the composition of one jury venire for one trial and the general county census figures from a different year. In Sixth Amendment fair cross-section cases, the defendants have submitted much more detailed data culled over multiple months. Even giving Parker "the benefit of the doubt on underrepresentation," *Smith*, 130 S. Ct. at 1394 (quoting *Smith*, 615 N.W.2d at 3), the Court does not believe that Parker has met his burden of demonstrating that "to the extent underrepresentation existed, . . . it [was] due to 'systematic exclusion[.]'" *Id.* (citing *Duren*, 439 U.S. at 364).

c.      **"Systematic exclusion"**

In addition to the assignment system that resulted in what Smith referred to as the "siphoning" of minority jurors from the court in which his trial was held, Smith pointed to several other features of the jury selection process as "systemic" causes of underrepresentation. *Smith*, 130 S. Ct. at 1395 (citation to record omitted). These included "[Kent] County's practice of excusing people who merely alleged hardship or simply failed to show up for jury service, its reliance on mail notices, its failure to follow up on nonresponses, its use of residential addresses at least 15 months old, and the refusal of Kent County police to enforce court orders for the appearance of prospective jurors." *Id.* (citation to record omitted). Parker similarly alluded to the

practice in Erie County of allowing hardship exemptions based upon jurors' difficulties in obtaining childcare, transportation, and time off from their jobs. Parker also claimed that the juror-source lists were deficient in that they did not include names from all lists and registries authorized by the Judiciary Law, such as those of account-holders with utility companies.

Emphasizing that the burden of proving causation in a fair cross-section claim rests with the defendant, the Supreme Court rejected Smith's argument: "No 'clearly established' precedent. . . supports Smith's claim that he can make out a prima facie case merely by pointing to a host of factors that, individually or in combination, *might* contribute to a group's underrepresentation." *Smith*, 130 S. Ct. at 1395 (emphasis in original). For this reason, the Supreme Court found, the Michigan state appellate court was "far from 'unreasonable,' [28 U.S.C.] § 2254(d)(1), in concluding that *Duren* first and foremost required [defendant] himself to show that the underrepresentation complained of was 'due to systematic exclusion.'" *Id.* (quoting *Duren*, 439 U.S. at 364). The Supreme Court went on to note that its case law "has never 'clearly established' that jury-selection-process features of the kind on Smith's list can give rise to a fair-cross-section claim." *Id.* (citing *Taylor*, 419 U.S. at 537-38) ("recogniz[ing] broad discretion in the States" to "prescribe relevant qualifications for their jurors and to provide reasonable exemptions"); *Duren*, 439 U.S. at 370 ("An exemption appropriately tailored to th[e] [State's] interest would, we think, survive a fair-cross-section challenge.")).[9]

---

[9]     The Supreme Court did not specifically rule out the possibility of a fair-cross-section challenge based on the impact of a State's juror exemptions or of social and economic factors on juror venires in *Duren* or *Smith*. *See Duren*, 439 U.S. at 367-68) ("We stress, however, that the constitutional guarantee to a jury drawn from a fair cross section of the community requires that States exercise proper caution in exempting broad categories of persons from jury service. Although most occupational and other reasonable exemptions may inevitably involve some degree of overinclusiveness or underinclusiveness, any category expressly limited to a group in the community of sufficient magnitude and distinctiveness so as to be within the fair-cross-section requirement–such as women–runs the danger of resulting in underrepresentation sufficient to constitute a prima facie violation of that constitutional

In light of the Supreme Court's decision in *Smith* clarifying what is "clearly established" law for purposes of AEDPA, this Court turns to the question of whether the Appellate Division's rejection of Parker's Sixth Amendment claim was objectively unreasonable in applying clearly established Supreme Court precedent.  On appeal, the Appellate Division held as follows:

> Defendant contends that he was denied his right to a jury representative of the community because of the underrepresentation of African-Americans and young people on the jury panel and the inadequacy of the various lists from which the jury panel was drawn. The court held a hearing on this issue, at which the New York State Commissioner of Jurors for Erie County testified that gender, age, and race are not considered in compiling the juror source list, that he followed [New York] Judiciary Law § 500 in obtaining juror names, and that juror names were drawn randomly from a source list compiled by the New York State Office of Court Administration. In response, defendant failed to establish that the systematic exclusion of a particular group is caused by means "'inherent in the particular jury-selection process utilized'" (*People v. Guzman*, 60 N.Y.2d 403, 411, 469 N.Y.S.2d 916, 457 N.E.2d 1143, *cert. denied* 466 U.S. 951, 104 S.Ct. 2155, 80 L.Ed.2d 541, quoting *Duren v. Missouri*, 439 U.S. 357, 366, 99 S.Ct. 664, 58 L.Ed.2d 579).

*People v. Guzman* quoted *Duren*, the seminal fair cross-section case; however, *People v. Guzman* involved Due Process and Equal Protection challenges to county's jury selection system, not a Sixth Amendment fair cross-section claim. *See People v. Guzman*,  89 A.D.2d 14, 454 N.Y.S.2d 852 (N.Y. App. Div. 2d Dept. 1982) ("Standards under fair cross-section requirements and the equal protection clause differ somewhat in that fair cross-section "distinctiveness" encompasses the broader principle that juries should be drawn from a source fairly representative of the community, whereas equal protection focuses upon classes which have historically been discriminatorily excluded or substantially underrepresented based upon race or national origin, etc. (*see Commonwealth v. Bastarache*, 382 Mass. 86, ___, 414 N.E.2d 984, 992; *compare*

---

requirement.")); *Smith* 130 S. Ct. at 1396 n. 6 ("We have also never 'clearly' decided, and have no need to consider here, whether the impact of social and economic factors can support a fair-cross-section claim.") (citations omitted).

*Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690, *with Castaneda v. Partida*, 430

U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498, *and San Antonio Independent School Dist. v.*

*Rodriguez*, 411 U.S. 1, 28, 93 S.Ct. 1278, 1293, 36 L.Ed.2d 16).”), *aff'd*, 60 N.Y.2d 403 (N.Y.

1983), *cert. denied sub nom. Guzman v. New York*, 466 U.S. 951 (1984).

In this Court's view, the Appellate Division's discussion of Erie County's procedure for

compiling juror source lists and its conclusion that it is facially neutral and random pertain to the

prima facie elements of Due Process or Equal Protection challenge. The Appellate Division also

did not address Parker's argument that two allegedly “distinctive groups” (i.e., young people and

African-Americans) are systematically excluded from jury selection. This is evident in the

Appellate Division's conclusion that Parker's “response” did not show that “the systematic

exclusion of *a* particular group is caused by means inherent in the particular jury-selection

process utilized[.]” (emphasis supplied). The Court reads this as simply saying that Erie County's

juror selection procedure is neutral facially and as applied. Unlike an equal protection challenge

to a jury pool, “a fair cross-section claim does not require a showing that the selection procedure

is susceptible [to] abuse or not race-neutral; the defendant must only show that the exclusion of

his or her group is ‘systematic.’” *Smith v. Berghuis*, 543 F.3d 326, 335, 336 (6th Cir. 2008)

(quoting *United States v. Rodriguez-Lara*, 421 F.3d 932, 939 (9th Cir. 2005) and citing *United*

*States v. Jackman*, 46 F.3d 1240, 1246 (2d Cir. 1995)), *rev'd on other grounds,* 130 S. Ct. 1382

(2010).

In this Court's reading of the decision, the Appellate Division conflated the elements of a

Due Process/Equal Protection jury pool claim with those of a Sixth Amendment fair cross-

section claim, and incorrectly stated the pertinent framework for assessing for Sixth Amendment

fair cross-section claims. As a result, the Court doubts that it must apply the deferential standard set forth in 28 U.S.C. § 2254(d). *Cf. Mask v. McGinnis*, 233 F.3d 132, 140 n.5 (2d Cir. 2000) ("When we are asked under the AEDPA to apply a stringent rule of deference to state court factual determinations that affect our application of federal law on habeas review, we can do so only when we know that the state court had, in fact, considered the factual issue that we determine to be dispositive. Here, the Appellate Division's summary recitation of the federal rule cannot transform the lower court's inapposite determinations under one standard into factual findings under the correct standard that require deference under 28 U.S.C. §§ 2254(d)(2), (e)(1)."). It is true that the Second Circuit has instructed that AEDPA's deferential standard of review applies whenever the state court has adjudicated the federal claim on the merits, regardless of whether it has alluded to federal law in its decision. *Sellan v. Kuhlman*, 261 F.3d 303, 311-12 (2d Cir. 2001) ("[W]hen a state court fails to articulate the rationale underlying its rejection of a petitioner's claim, and when that rejection is on the merits, the federal court will focus its review on whether the state court's ultimate decision was an 'unreasonable application' of clearly established Supreme Court precedent."); *accord Aeid v. Bennett*, 296 F.3d 58, 62 (2d Cir. 2002) ("Because the state courts summarily rejected Aeid's ineffective assistance of counsel claim on the merits without explanation, we must focus on the ultimate decisions of those courts, rather than on the courts' reasoning."). Here, however, the Court believes that although the *Parker* court articulated the rationale underlying its rejection of the fair cross-section claim, that rationale was incorrect, based as it was on a misapprehension of the proper legal standard and burden of proof.

Viewing Parker's fair cross-section *de novo*, that is, under the pre-AEDPA standard, this

Court nevertheless concludes that he has not demonstrated a *prima facie* case under the Sixth Amendment. In order to illustrate the demanding burden of proof placed upon a defendant making a fair cross-section claim, this Court here repeats the *Smith* court's summary of its "pathmarking decision[,]" 130 S. Ct. at 1392, in *Duren v. Missouri*:

> The defendant in *Duren* successfully challenged Jackson County's administration of a Missouri exemption permitting any woman to opt out of jury service. 439 U.S., at 360, 99 S.Ct. 664. The Court explained why it was plain that defendant Duren had established a *prima facie* case. First, women in Jackson County were both "numerous and distinct from men." *Id.*, at 364, 99 S.Ct. 664 (quoting *Taylor*, 419 U.S., at 531, 95 S.Ct. 692). Second, Duren's "statistical presentation" showed gross underrepresentation: Women were over half the jury-eligible population; in stark contrast, they accounted for less than 15% of jury venires. 439 U.S., at 364-366, 99 S.Ct. 664.
>
> Duren also demonstrated systematic exclusion with particularity. He proved that women's underrepresentation was persistent–occurring in every weekly venire for almost a year-and he identified the two stages of the jury–selection process "when . . . the systematic exclusion took place." *Id.*, at 366, 99 S.Ct. 664. First, questionnaires for prospective jurors stated conspicuously that women could opt out of jury service. Less than 30% of those summoned were female, suggesting that women in large numbers claimed the exemption at the questionnaire stage. *Ibid.* "Moreover, at the summons stage women were . . . given another opportunity to [opt out]." *Id.*, at 366-367, 99 S.Ct. 664. And if a woman ignored the summons, she was deemed to have opted out; no further inquiry was made. *Id.*, at 367, 99 S.Ct. 664. At this "final, venire, stage," women's representation plummeted to 14.5%. *Ibid.* In the Federal District Court serving the same territory, the Court noted, despite a women-only childcare exemption, women accounted for nearly 40% of those actually serving on juries. *See ibid.*, n. 25.
>
> The "disproportionate and consistent exclusion of women from the [Jackson County] jury wheel and at the venire stage," the Court concluded, "was quite obviously due to the system by which juries were selected." *Id.*, at 367, 99 S.Ct. 664. "[A]ppropriately tailored" hardship exemptions, the Court added, would likely survive a fair-cross-section challenge if justified by an important state interest. *Id.*, at 370, 99 S.Ct. 664. But no such interest, the Court held, could justify Missouri's exemption for each and every woman–the altogether evident explanation for the underrepresentation. *Id.*, at 369-370, 99 S.Ct. 664.

*Smith*, 130 S.Ct. at 1392-93 (alterations in original). First, there is the issue of whether Parker has

come forward with enough statistical proof enabling a reviewing court to conclude, by any statistical method, that there was a constitutionally significant disparity between the representation of the "distinctive group" and the rest of the relevant population in Erie County jury venires. Second, even assuming that Parker could show underrepresentation, he has not made a sufficient showing on the third prong of *Duren*, which requires him to show that the exclusion was "systematic" and that it *caused* the underrepresentation. Like the defendant in *Smith*, Parker has identified a number of factors, that taken singly or in combination, only *might* have contributed to underrepresentation of the distinctive group at issue.

      **E.**    **Equal Protection Challenge to the Jury Selection System**

      Parker also challenges the jury selection process on the grounds that it violated his rights under the Equal Protection Clause of the Fourteenth Amendment. *See Peters v. Kiff*, 407 U.S. 493, 497 (1972) ("There can be no doubt that, if petitioner's allegations are true, both tribunals involved in this case were illegally constituted. He alleges that Negroes were systematically excluded from both the grand jury and the petit jury. This Court has repeatedly held that the Constitution prohibits such selection practices, with respect to the grand jury, the petit jury, or both.") (footnotes omitted). *See also id.* at 502-03 ("These principles compel the conclusion that a State cannot, consistent with due process, subject a defendant to indictment or trial by a jury that has been selected in an arbitrary and discriminatory manner, in violation of the Constitution and laws of the United States. Illegal and unconstitutional jury selection procedures cast doubt on the integrity of the whole judicial process. They create the appearance of bias in the decision of individual cases, and they increase the risk of actual bias as well."); *accord Lockhart v. McCree*, 476 U.S. at 175.

In order to establish a prima facie violation of the right to equal protection in the context of a juror selection system, a petitioner must establish that: 1) recognizable and distinct classes have been singled out for different treatment under the law, as written and applied; 2) a substantial degree of underrepresentation of distinctive groups on juries has occurred over a significant period of time; and 3) the jury selection procedure is not racially neutral and is susceptible to abuse. *Castaneda v. Partida*, 430 U.S. 482, 494 (1977); *accord People v Guzman*, 60 N.Y.2d 403. The Supreme Court in *Castaneda*, a case involving alleged discrimination in a grand jury system, explained as follows:

> Thus, in order to show that an equal protection violation has occurred in the context of grand jury selection, the defendant must show that the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs. The first step is to establish that the group is one that is a recognizable, distinct class, singled out for different treatment under the laws, as written or as applied. *Hernandez v. Texas*, 347 U.S., at 478-479, 74 S.Ct., at 670-671. Next, the degree of underrepresentation must be proved, by comparing the proportion of the group in the total population to the proportion called to serve as grand jurors, over a significant period of time. *Id.*, at 480, 74 S.Ct., at 671. *See Norris v. Alabama*, 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935). This method of proof, sometimes called the 'rule of exclusion,' has been held to be available as a method of proving discrimination in jury selection against a delineated class. *Hernandez v. Texas*, 347 U.S., at 480, 74 S.Ct., at 671. Finally, as noted above, a selection procedure that is susceptible of abuse or is not racially neutral supports the presumption of discrimination raised by the statistical showing. *Washington v. Davis*, 426 U.S., at 241, 96 S.Ct., at 2048; *Alexander v. Louisiana*, 405 U.S., at 630, 92 S.Ct., at 1225. Once the defendant has shown substantial underrepresentation of his group, he has made out a prima facie case of discriminatory purpose, and the burden then shifts to the State to rebut that case.

*Castaneda*, 430 U.S. at 495. As to the first prong, African-Americans are a "recognizable, distinct class," capable of being "singled out for different treatment under the laws," *Castaneda*, 430 U.S. at 495. However, the Court does not believe that Parker has established the other

components of a prima face case of an equal protection violation, and the Appellate Division was not incorrect in denying relief on this claim on appeal. In particular, the Appellate Division did not unreasonably determine the facts in light of the evidence presented at the hearing before the trial court regarding aspects of the jury selection process relevant to the equal protection claim. Parker has not made the requisite statistical showing that there was underrepresentation of African-Americans "over a significant period of time," *Castaneda*, 430 U.S. at 495. The statistical showing is required to raise a presumption of discrimination, which may be strengthened by proof of a selection procedure that is susceptible of abuse or is not racially neutral. *See id.* The commissioner of jurors testified that gender, age, and race are not considered in compiling the juror source list, that he followed New York Judiciary Law § 500 in obtaining juror names, and that juror names were drawn randomly from a source list compiled from facially neutral lists and registries authorized by the Judiciary Law. Parker has not shown the Erie County's juror selection process is not racially neutral. Furthermore, he has not demonstrated that it is susceptible to abuse. *Cf. People v. Guzman*, 60 N.Y.2d at 413 ("On defendant Guzman's appeal, as in Wells's appeal, there is no dispute that Hispanics are a 'recognizable, distinct class, [which has been] singled out for different treatment under the laws' (*Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 1280, 51 L.Ed.2d 498, *supra*), or that Hispanics have been substantially underrepresented in the Kings County jury pools for a significant period of time. In addition, it was established that there are subjective factors, such as rejection for failure to sufficiently comprehend English, that are injected into the selection system during the qualification interview process. The opportunity for such subjective judgments in the process established that it was 'susceptible to abuse,' which supported the presumption of discrimination

raised by the statistical showing of underrepresentation. Defendant thus established a prima facie case that his right to equal protection had been violated.").

IV. **Conclusion**

For the reasons stated above, Jonathan Parker's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is denied, and the petition is dismissed. Because I do not find that Parker has made a "substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I decline to issue a certificate of appealability, *see id.*

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:      June 8, 2010
            Buffalo, New York.